UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

QUINTEISE DOUGLAS,
MARKISHA WILSON, and
J.R., a minor by his mother
and natural guardian,
MARKISHA WILSON,

     Plaintiffs,

v.                                    Case No. 8:24-cv-2569-VMC-AAS

SHERIFF GRADY JUDD, in his
official capacity as Sheriff
of Polk County, Florida,
JESSICA WILLIAMS, individually,
and DIAMOND HAYNES,
individually,

     Defendants.
_____/

## ORDER

This matter comes before the Court upon consideration of Defendants' Motion for Summary Judgment (Doc. # 48), Plaintiffs' Motion in Limine (Doc. # 54), and Defendants' Motion in Limine (Doc. # 55). For the reasons that follow, the Motion for Summary Judgment is granted in part and denied in part. Summary judgment is granted in favor of Defendant Diamond Haynes on Count I. The remaining counts, Counts II, III, IV, and VI, are dismissed without prejudice. The Motions in Limine are denied as moot.

1

## I.    Background

### A.    The Parties

Defendant Jessica Williams is a deputy with the Polk County Sheriff's Office ("PCSO"). (Doc. # 47-6 at 5:1-6). In April 2022, Deputy Williams lived in the same neighborhood in Bartow, Florida, as Plaintiffs, Markisha Wilson, Quinteise Douglas, and J.R., as well as nonparty Larry McCutchen. (Doc. # 47-1 at 6, 8, 12, 20; Doc. # 47-6 at 7:9-12). Ms. Wilson is the mother of Ms. Douglas, J.R., and Mr. McCutchen. (Doc. # 47-11 at 29:24-30:3). At the time, Ms. Douglas and Mr. McCutchen were adults, and J.R. was 15 years old. (Doc. # 47-1 at 6, 8, 10). Defendant Diamond Haynes is a PCSO detective who investigated an incident involving Deputy Williams, Plaintiffs, and Mr. McCutchen. (Doc. # 47-5 at 5:3-4, 6:1, 10:13-11:22).

### B.    The Incident

On the evening of April 23, 2022, Deputy Williams drove home at the end of her shift. (Doc. # 47-6 at 6:19-7:8). She was having a conversation outside with her neighbor, Jose Perez, when his dog, Chico, got loose and ran eastbound, trailed by Mr. Perez's 12-year-old son, Yosgar. (Doc. # 47-1 at 14-15; Doc. # 47-6 at 17:2-18:19). Deputy Williams told Mr. Perez that she would help Yosgar get the dog and began

2

driving around the neighborhood. (Doc. # 47-6 at 18:19-19:20).

In the meantime, Chico went into Ms. Wilson's backyard and bit Ms. Douglas's one-year-old son as well as Ms. Wilson's small dog. (Doc. # 47-1 at 19; Doc. # 47-11 at 5:22-25, 13:7-14:5). Ms. Douglas and Mr. McCutchen were able to get Chico off the child and the other dog. (Doc. # 47-11 at 6-13). Yosgar then called out to Chico and both ran off. (Id.). As Deputy Williams was driving back home, she was stopped by Ms. Wilson, who told her about the incident. (Doc. # 47-6 at 19:25-20:15); Doc. # 52-11 at 13:10-14:1). Deputy Williams then saw Mr. McCutchen, Ms. Douglas, and J.R. chasing and screaming at Yosgar as he was running down the street with Chico. (Doc. # 47-6 at 20:25-21:2; Doc. # 47-8 at ¶¶ 2-3; Doc. # 47-9 at ¶¶ 3-5).

When Deputy Williams returned home, she tried to separate Mr. Perez, Yosgar, and Chico, who were in her front yard, from Mr. McCutchen, Ms. Douglas, and J.R., who were in her driveway and were upset and yelling that they wanted to kill Chico. (Doc. # 47-6 at 25:7-23, 26:25-30:2; Doc. # 47-8 at ¶ 7; Doc. # 52-5 at 8). Ms. Wilson then came onto Deputy Williams's driveway and began yelling at her as well. (Doc. # 47-1 at 7). Deputy Williams started to fear for her safety

3

as she was outnumbered by Plaintiffs and Mr. McCutchen. (Id.). Ultimately, Plaintiffs and Mr. McCutchen complied with Deputy Williams's demands that they get off her property, and the verbal altercation continued from the street in front of her house. (Id.).

At some point, Deputy Williams made a "broadcast over the Southeast Dispatch Channel information related to an in-progress, aggressive disturbance regarding a dog bite in the area of her private residence and was requesting Bartow Police Department [to] respond." (Id. at 4). "Due to the urgency detected" in Deputy Williams's broadcast, PCSO Deputy Kaleigh Nicole Evans "responded in emergency mode (lights and siren) and planned to maintain order at the scene until Bartow Police Department could also arrive." (Id.). Upon arrival, Deputy Evans observed Deputy Williams attempting to get Plaintiffs and Mr. McCutchen "to back away from her property." (Id.). Shortly after, as officers from Bartow Police Department ("BPD") and additional PCSO officers arrived, Mr. McCutchen and Plaintiffs left and went to their nearby home. (Id. at 4-5; Doc. # 52-8 at 1 ¶ 2). Deputy Williams told BPD officers on the scene that she was okay and that she had not been battered or injured. (Doc. # 52-7 at 3 ¶ 3; Doc. # 52-8 at 2 ¶ 3).

4

PCSO, rather than BPD, investigated the incident involving Deputy Williams. (Doc. # 47-5 at 11:16-22; Doc. # 52-7 at 4 ¶ 2). Detective Haynes began the investigation that evening. (Doc. # 47-5 at 10:7-22, 11:8-14, 11:24-12:14). Detective Haynes did not personally know Deputy Williams prior to the investigation. (Id. at 19:24-20:4).

Detective Haynes first took a recorded statement from Deputy Williams. (Id. at 13:8-14:3, 16:4-25). Detective Haynes's written report describes Deputy Williams's statement as follows. As Deputy Williams drove home after looking for Chico, Mr. McCutchen, Ms. Douglas, and J.R. "were flailing their arms in an aggressive manner and appeared to be angry" as they walked westbound. (Doc. # 47-1 at 7). Deputy Williams arrived at her home and told Mr. Perez that "something has happened to his dog and Yosgar." (Id.). Deputy Williams, Mr. Perez, and Yosgar "were able to get the dog contained" in her front yard. (Id.). Mr. McCutchen approached Detective Haynes's driveway "in an aggressive manner stating, 'where is he at because I am going to fucking kill him.'" (Id.). Mr. McCutchen, Ms. Douglas, and J.R. then entered Deputy Williams's driveway "in an aggressive manner." (Id.). Deputy Williams told Mr. McCutchen, Ms. Douglas, and J.R. several times to leave her property, but they did not comply. (Id.).

5

Ms. Wilson, who was "irate and yelling profanities," then entered the driveway, "placing [Deputy] Williams in fear that she would be harmed by [Ms.] Wilson." (Id.). The situation escalated, with Mr. McCutchen "asking where Yosgar was so he could 'kill' him" and pushing Deputy Williams, who had stepped in front of Mr. McCutchen to prevent him from getting closer to Yosgar. (Id.). Mr. McCutchen and Ms. Douglas told Deputy Williams that they will kill her, and Ms. Wilson yelled at Deputy Williams, who again told them to leave her property. (Id.). At this point, Deputy Williams "felt in fear for her safety since she was outnumbered by the subjects and they were very irate." (Id.). Two of Deputy Williams's neighbors, Tommy Thomas and Nicole Thomas, then came onto Deputy Williams's property. (Id.). Mr. Thomas told Plaintiffs and Mr. McCutchen to leave Deputy Willliams alone, and Ms. Thomas recorded part of the incident. (Id.). Ultimately, Plaintiffs and Mr. McCutchen went into the roadway and then returned to their home when several law enforcement units arrived. (Id.).

Detective Haynes interviewed other witnesses, Ms. Thomas, Mr. Thomas, Mr. Perez, Yosgar, Sandra Young, and Nicholas Young, who largely corroborated Deputy Williams's account and who stated as follows. (Id. at 7-8, 19).

6

Ms. Thomas saw Ms. Douglas and J.R. chasing Yosgar down the street and heard Ms. Douglas, J.R., and Mr. McCutchen stating that they wanted to kill Yosgar. (Id. at 7). Ms. Thomas also saw Mr. McCutchen push Deputy Williams. (Id.). Ms. Thomas called 911 and feared for Deputy Williams's safety because "she was surrounded by the subjects." (Id.).

Mr. Thomas saw Mr. McCutchen push Deputy Williams in the chest. (Id.). Mr. McCutchen also threatened to harm Mr. Thomas. (Id.). Mr. Thomas saw Mr. McCutchen, Ms. Douglas, and J.R. being aggressive toward Deputy Williams on her property. (Id.). According to Mr. Thomas, it appeared that the group was trying to get closer to Mr. Perez and Yosgar. (Id.).

Mr. Perez reported that after Yosgar and Chico returned, Deputy Williams told him to "get ready" because Chico bit someone. (Id. at 7-8). Plaintiffs and Mr. McCutchen then approached them "aggressively." (Id. at 8). Mr. Perez saw someone push Deputy Williams but could not identify who did it. (Id.).

Yosgar acknowledged that he saw Chico bite a child and another dog at the Wilson residence. (Id.). Yosgar also saw Mr. McCutchen push Deputy Williams. (Id.). The actions of Plaintiffs and Mr. McCutchen were aggressive and made him afraid. (Id.).

Ms. Young and Mr. Young saw the incident from inside their residence. (Id. at 19). According to them, Plaintiffs and Mr. McCutchen appeared aggressive. (Id.). Ms. Young and Mr. Young heard Deputy Williams telling the group to leave her property and go home but "could not make out anything else that was said." (Id.).

Detective Haynes also reviewed the video footage taken by Ms. Thomas. (Id. at 9). The first video begins with Mr. McCutchen and Plaintiffs walking toward Deputy Williams's driveway, with Mr. McCutchen, Ms. Wilson, and Ms. Douglas yelling, while Deputy Williams attempts to keep them separated from Mr. Perez. (Doc. # 47-9 at Ex. A – Video 1). Mr. Perez then walks away from the group, and Deputy Williams stands at the edge of driveway near Ms. Douglas and Ms. Wilson, who are yelling at her. (Id.). It appears that Ms. Wilson then begins yelling at Ms. Thomas while Mr. McCutchen, who is standing to the right of Deputy Williams, yells at Mr. Thomas. (Id.). Deputy Williams instructs the group to stay off her property. (Id.). As Mr. McCutchen yells, seemingly at Mr. Thomas, to "come to the street," Ms. Wilson tells her children to go home. (Id.). Mr. Perez again walks toward the group in the street, exacerbating the situation. (Id.). Deputy Williams then physically places herself between the

8

group and Mr. Perez, instructing Mr. Perez to back up while the group stands in front of her and continues to yell. (Id.).

The second video shows Ms. Wilson and Deputy Williams in the street in front of the driveway, while Ms. Douglas, J.R., and Mr. McCutchen are on the sidewalk across the street. (Id. at Ex. A – Video 2). Ms. Douglas tries to calm Mr. McCutchen, who is yelling at someone on Deputy Williams's property. (Id.). Ms. Wilson yells at Deputy Williams that this is the second time one of her family members has been attacked by a dog in the neighborhood. (Id.). Mr. McCutchen then begins yelling and again tells someone to "come to the street," while Ms. Williams tries to get him to stop. (Id.). There is at least one other law enforcement officer at the scene during this video. (Id.).

After speaking to the witnesses, Detective Haynes went to Ms. Wilson's home and interviewed each Plaintiff. (Doc. # 47-1 at 8, 10, 14). J.R. and Ms. Douglas stated that, after the dog bit Ms. Douglas's son, they walked down the street to find the dog's owner. (Id. at 8, 10). J.R. denied pushing anyone or going into Deputy Williams's yard. (Id. at 8). Ms. Douglas also denied pushing anyone but admitted going into Deputy Williams's yard because she saw the dog. (Id. at 10).

9

Ms. Wilson denied battering or threatening anyone. (Id. at 14).

Detective Haynes placed Plaintiffs under arrest. (Id. at 8, 10, 14). Each Plaintiff was charged with burglary with assault in violation of Florida Statute § 810.02(2)(a). (Id. at 6, 8, 12). Ms. Douglas additionally was charged with assault in violation of Florida Statute § 784.011 and corruption by threat against public servant in violation of Florida Statute § 838.021(3)(b). (Id. at 8). All charges against Plaintiffs were dropped. (Doc. # 47-5 at 32:10-30).

C.    **Procedural History**

Plaintiffs initiated this action on November 4, 2024. (Doc. # 1). The second amended complaint asserts the following claims: false arrest and false imprisonment in violation of 42 U.S.C. § 1983 against Detective Haynes (Count I); state-law false arrest and false imprisonment against Sheriff Judd and Detective Haynes (Counts II and III); state-law malicious prosecution against Deputy Williams and Detective Haynes (Count IV); defamation against Deputy Williams (Count V); and intentional infliction of emotional distress against Deputy Williams (Counts VI). (Doc. # 30).

The Court granted Defendants' unopposed motion to dismiss Count V. (Doc. # 33). Accordingly, only Counts I, II,

10

III, IV, and VI remain. Defendants filed their amended answer and affirmative defenses on October 13, 2025. (Doc. # 46).

Defendants now move for summary judgment on all remaining claims. (Doc. # 48). Plaintiffs responded. (Doc. # 53). Plaintiffs and Defendants also have filed Motions in Limine (Doc. ## 54, 55). Each party responded. (Doc. # 56, 57). The Motions are ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.

11

1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at 324).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true, and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's

12

response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

III. **Analysis**

   A.   **Section 1983 False Arrest and False Imprisonment Claim against Detective Haynes**

Defendants argue that Detective Haynes is entitled to summary judgment on Count I because there was probable cause for her arrests of Plaintiffs. (Doc. # 48 at 9-13). Alternatively, Defendants argue that summary judgment on Count I is warranted because Detective Haynes is entitled to qualified immunity. (Id. at 13-14). In response, Plaintiffs argue that there is a genuine dispute as to whether Detective Haynes had even arguable probable cause for the arrests. (Doc. # 53 at 10-16). The Court agrees with Defendants that Detective Haynes had probable cause to arrest Plaintiffs.

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim, but the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010). "Probable cause exists where the facts

13

within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." Id. "[T]he correct legal standard to evaluate whether an officer had probable cause to seize a suspect is to ask whether a reasonable officer could conclude . . . that there was a substantial chance of criminal activity." Garcia v. Casey, 75 F.4th 1176, 1186 (11th Cir. 2023) (internal quotation marks omitted). "A substantial chance is all that is required, 'not an actual showing of such activity.'" Davis v. City of Apopka, 78 F.4th 1326, 1334–35 (11th Cir. 2023) (quoting District of Columbia v. Wesby, 583 U.S. 48, 57 (2018)). "Under the 'any-crime rule' an officer is 'insulate[d] from false-arrest claims so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred.'" Garcia, 75 F.4th at 1187 (11th Cir. 2023) (quoting Williams v. Aguirre, 965 F.3d 1147, 1158 (11th Cir. 2020)).

"An arresting officer is required to conduct a reasonable investigation to establish probable cause." Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). "An officer, however, need not take every conceivable step . . . at

14

whatever cost, to eliminate the possibility of convicting an innocent person." Id. at 1436 (internal quotation marks omitted). "In general, reliance upon eyewitness testimony, including that of a victim of a crime, is sufficient to establish probable cause." Scott v. City of Miami, 139 F.4th 1267, 1274 (11th Cir. 2025). "[E]vidence of every element of a crime is not required for a showing of probable cause." Davis, 78 F.4th at 1335. "Moreover, the presence of contradictory evidence does not bar a finding of probable cause." Scott, 139 F.4th at 1274. "An officer is not required to believe [exculpatory evidence] or to weigh the evidence in such a way as to conclude that probable cause did not exist." Id. (internal quotation marks omitted).

"Absent probable cause, an officer is still entitled to qualified immunity if arguable probable cause existed." Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009). "Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed that probable cause existed to arrest." Id. (internal quotation marks omitted). "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that

15

probable cause exists." Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007).

Defendants argue that there was probable cause for Plaintiffs' arrests because "the totality of the circumstances known to [Detective] Haynes would lead any reasonable officer to believe that Plaintiffs had committed at least the criminal offense of assault (threatening violence)." (Doc. # 48 at 12). In response, Plaintiffs argue that there was not even arguable probable cause to arrest them for disorderly conduct, let alone for assault. (Doc. # 53 at 11-13). Plaintiffs contend that, "at best, the Defendants can show that these three Plaintiffs yelled and even cursed at [Deputy] Williams while she was in her front yard or driveway." (Id. at 13). The Court agrees with Defendants.

Under Florida law, an "'assault' is an intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Fla. Stat. § 784.011(1). An assault conviction does not require an explicit threat. Mantecon v. State, 373 So. 3d 929, 941 (Fla. 1st DCA 2023). A defendant's actions can be sufficient

16

evidence of an unlawful threat by act to harm another person. See Pinkney v. State, 74 So. 3d 572, 577 (Fla. 2d DCA 2011) ("It is undisputed that Mr. Pinkney's act of backing his car in the direction of Officer Zammitt constituted a threat of violence."); Martinez v. State, 561 So. 2d 1279, 1280-81 (Fla. 2d DCA 1990) (holding that "a threat need not be accompanied by intelligible words in order to be adequately conveyed and understood" and that, under the circumstances, the defendant's actions would be sufficient).

Here, Deputy Williams and all the nonparty witnesses interviewed prior to Plaintiffs' arrests told Detective Haynes that there was an aggressive altercation in front of Deputy Williams's house on the evening in question, which is corroborated by the video footage. (Doc. # 47-1 at 7-8, 19; Doc. # 47-9 at Ex. A). Deputy Williams reported that Ms. Douglas threatened to kill her. (Doc. # 47-1 at 7). Although none of the witnesses stated that Ms. Wilson or J.R. made explicit verbal threats to Deputy Williams, Deputy Williams told Detective Haynes that the fact that she was outnumbered by a group of irate people who refused, at least initially, to leave her property placed her in fear for her safety. (Id.). Deputy Williams's account was corroborated by Ms. Thomas, who stated that she called 911 when she observed the

17

group surrounding Deputy Williams because she was afraid for Deputy Williams's safety. (Id.).

Viewing the facts in the light most favorable to Plaintiffs, Defendants have demonstrated that Detective Haynes had probable cause to arrest Plaintiffs. Although Plaintiffs dispute that their conduct was criminal, there is no dispute over what Deputy Williams and the nonparty witnesses told Detective Haynes. A reasonable officer considering the statements from Deputy Williams and the nonparty witnesses, as well as the video, could conclude there was a substantial chance that Plaintiffs had committed an assault under Florida law. See Scott, 139 F.4th at 1274 ("In general, reliance upon eyewitness testimony . . . is sufficient to establish probable cause."); Huebner v. Bradshaw, 935 F.3d 1183, 1188 (11th Cir. 2019) (holding that an arresting officer is not "required to sift through conflicting evidence or resolve issues of credibility, so long as the totality of the circumstances present[ed] a sufficient basis for believing that an offense ha[d] been committed" (internal quotation marks omitted)). Detective Haynes was not required to believe Plaintiffs' accounts of the incident. See Scott, 139 F.4th at 1274 ("[A] police officer need not resolve conflicting evidence in a manner

18

favorable to the suspect." (internal quotation marks omitted)). In any event, as reasonable officers in Detective Haynes's position could have believed that probable cause existed to arrest Plaintiffs, Defendants have shown that Detective Haynes at least had arguable probable cause and, therefore, would be entitled to qualified immunity. Case, 555 F.3d at 1327.

In response, Plaintiffs argue that Detective Haynes did not have even arguable probable cause to arrest Plaintiffs. They emphasize that they were not arrested by any of the BPD officers who responded to the scene and who "spoke directly to [Deputy Williams] and watched the video of how the horrified Wilson family, whose toddler had just been mauled by a dog, was acting towards [Deputy] Williams, who they yelled at and screamed at for, at a maximum, 10 minutes or so." (Doc. # 53 at 12-13). However, it is undisputed that PCSO, not BPD, assumed responsibility for investigating the incident. (Doc. # 47-5 at 11:16-22; Doc. # 52-7 at 4 ¶ 2). Plaintiffs also point to the fact that Deputy Williams told BPD officers on the scene that she was fine and had not been battered or injured. (Doc. # 53 at 13). But Deputy Williams's statements to the BPD officers do not contradict her statements to Detective Haynes that Plaintiffs' conduct made

19

her fear for her safety. Plaintiffs, therefore, have not demonstrated a genuine issue of material fact as to whether Detective Haynes had probable cause or, at a minimum, arguable probable cause for the arrests. See Allen, 121 F.3d at 646 ("An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case.")

Accordingly, summary judgment is granted on Count I.

### B.   State-Law Claims

Having found that Detective Haynes is entitled to summary judgment on Plaintiffs' only federal claim, Count I, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims, Counts II, III, IV, and VI. See 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) . . . if the district court has dismissed all claims over which it has original jurisdiction."). Resolution of Plaintiffs' remaining claims "depends on determinations of state law," and "[s]tate courts, not federal courts, should be the final arbiters of state law." Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1353 (11th Cir. 1997); Raney v. Allstate Ins. Co., 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any

remaining state claims when, as here, the federal claims have been dismissed prior to trial."). The Court finds that principles of judicial economy, fairness, convenience, and comity weigh in favor of having a state court decide Plaintiffs' state-law claims. Baggett, 117 F.3d at 1353.

Therefore, Counts II, III, IV, and VI are dismissed without prejudice. Pursuant to 28 U.S.C. § 1367(d), the statute of limitations is tolled for a period of 30 days after the claims are dismissed "unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)   Defendants' Motion for Summary Judgment (Doc. # 48) is **GRANTED IN PART**. Summary judgment in favor of Defendant Diamond Haynes is granted on Count I. The Motion is otherwise **DENIED.**

(2)   Because the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims, Counts II, III, IV, and VI are **DISMISSED WITHOUT PREJUDICE.** The statute of limitations is tolled pursuant to 28 U.S.C. § 1367(d).

(3)   Plaintiffs' Motion in Limine (Doc. # 54) is **DENIED** as moot.

21

(4)   Defendants' Motion in Limine (Doc. # 55) is **DENIED** as moot.

(5)   The Clerk is directed to enter judgment in favor of Defendant Diamond Haynes and against Plaintiffs on Count I.

(6)   Thereafter, the Clerk is directed to cancel the pretrial conference scheduled for February 27, 2026, terminate all deadlines, and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 2nd day of February, 2026.

_____
VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE